**HYDRA–RIG,
INCORPORATED, Appellant,**

v.

**ETF CORPORATION, Appellee.**

No. 2–85–073–CV.

Court of Appeals of Texas,
Fort Worth.

April 24, 1986.

McLean Sanders Price Head & Ellis and Anne Gardner and Kenneth L. McAlister, Fort Worth, for appellant.

Goins, Underkofler, Crawford & Langdon and Richard E. Schellhammer, Dallas, for appellee.

Before BURDOCK, HOPKINS and HUGHES (Retired, Sitting by Assignment), JJ.

## OPINION

HUGHES, Justice (Retired, Sitting by Assignment).

In this suit in which Hydra-Rig, Inc. sought to establish a mechanics lien for the value of labor and materials expended in modification of an oil snubbing unit, the trial judge, sitting without a jury, found that ETF was not indebted to Hydra-Rig and that Hydra-Rig failed to establish a mechanics lien for which they had sued. Hydra-Rig has appealed the judgment of the court.

We affirm.

ETF leased a snubbing unit to Oklahoma Hydraulic Well Control, Inc. (OHWC) on a lease-purchase basis. The written lease agreement provided OHWC was responsible for all repairs. There were no marks on the unit to indicate that it was owned by ETF. Several months of use passed and OHWC had trouble with the unit. They asked Hydra-Rig to modify it for them. Hydra-Rig agreed to do so and completed the job by November 30, 1982. Upon being billed for the work, OHWC informed Hydra-Rig that it did not own the rig. During this time ETF began looking for the unit and located it in the custody of Hydra-Rig. At that time ETF told Hydra-Rig that it was the owner of the unit and that OHWC was only the lessee. ETF also told Hydra-Rig that OHWC had no authority to authorize the work that was done. Hydra-Rig told ETF it could have the unit if it paid for the work which had been done on the unit.

ETF then filed suit against Hydra-Rig for conversion. Hydra-Rig filed a counterclaim for the value of the labor and materials furnished. By agreement, ETF regained possession of the unit and sold it at a private sale for less than the amount of the claim by Hydra-Rig for renovation. ETF took a non-suit as to the conversion part of the action. The case then proceeded to trial on the counterclaim for the value of labor and materials claimed by Hydra-Rig.

Findings of fact and conclusions of law were filed in which the court found that OHWC was not the express or implied agent for ETF when it contracted with Hydra-Rig for the repairs and modification. The trial court also found that ETF did not receive any benefit from such repairs and alteration.

In this case we come face to face first with Law of April 7, 1874, ch. 58, sec. 1, 1874 Tex.Gen.Laws 68, 8 H. GAMMEL, LAWS OF TEXAS 70 (1898) (hereinafter referred to as Tex.Rev.Civ.Stat.Ann. art. 5503) *repealed by* Act of June 19, 1983, ch. 576, sec. 6, 1983 Tex.Gen.Laws 3475, 3729–30, and *amended by* Act of June 19, 1983, ch. 636, sec. 5, 1983 Tex.Gen.Laws 4060, 4064–65 (now codified at TEX.PROP.CODE ANN. sec. 70.001 (Vernon 1984)). Article 5503 provides the basis for Hydra-Rig's counterclaim wherein it seeks to establish a possessory artisans or mechanics lien.

Article 5503 reads as follows:

Whenever any article, implement, utensil or vehicle shall be repaired with labor and material, or with labor and without furnishing material by any carpenter, mechanic, artisan, or other workman in this State, such carpenter, mechanic, artisan, or other workman is authorized to retain possession of said article, implement, utensil, or vehicle until the amount due on same for repairing by contract shall be fully paid off and discharged. In case no amount is agreed upon by contract, then said carpenter, mechanic, artisan, or other workman shall retain possession of such article, implement, utensil or vehicle, until all reasonable, customary and usual compensation shall be paid in full.

Also we have before us the written contract between ETF and OHWC and we now refer to secs. five and six for consideration in this case which read as follows:

## SECTION FIVE

### Alterations

Lessee is hereby given the right to make alterations, additions or improvements to

the unit, so long as its value is not reduced thereby. All additions to and improvements of the unit of any kind shall immediately become the property of lessor and subject to the terms of this lease.

## SECTION SIX

### Maintenance and Repair

Lessee agrees to keep the unit in good repair and operating condition, allowing for reasonable wear and tear. Lessee agrees to pay all expenses of maintaining and repairing the unit. Expenses of repair shall include labor, material, parts, and similar items.

The contract also provided that the rig should not be moved out of the State of Oklahoma.

■ Repairs or improvements must have been authorized by the owners of a piece of property in order to give validity to a lien under the above-noted art. 5503. *Southwestern Investment Co. v. Gilbreath,* 380 S.W.2d 196, 197 (Tex.Civ.App. —Amarillo 1964, no writ). An agent for the owner may give such authority either expressly, impliedly, or apparently. *Saunders v. Commercial Industries Serv. Co.,* 541 S.W.2d 658, 660–61 (Tex.Civ.App.— Eastland 1976, writ ref'd n.r.e.). Hydra-Rig urges that, at the very least, an apparent agency relationship existed between OHWC and ETF for the repairs and renovations which form the basis of this suit.

On the basis of the evidence adduced in this case, we conclude that OHWC was clothed with an apparency of ownership and was able, because of such, to have Hydra-Rig do the work which was done on the equipment relying on this apparent ownership of the property in question. In this case the contract was made with Hydra-Rig without there being any revelation of there even being a principal-agency relationship. The evidence reflects that no questions were asked about ownership of the rig, and it is apparent that Hydra-Rig assumed that OHWC was the owner of such rig, and therefore, able to confer the lien. Hydra-Rig asserts that ETF put

OHWC in position to do this by turning over the equipment to OHWC without placing any notice upon the machinery (as was provided that it might do in its contract with OHWC), and thereby gave Hydra-Rig no indication that anyone but OHWC was involved with such machinery. Hydra-Rig thereby became entitled to move against ETF. *See Moerbe v. Meece,* 630 S.W.2d 278, 281 (Tex.App.—Austin 1981), *rev'd in part on other grounds,* 631 S.W.2d 729 (Tex.1982).

Also, Hydra-Rig asserts that the undisclosed principal, ETF, in retaining the benefits accruing to it by virtue of the renovation and repairs made by Hydra-Rig, became liable to Hydra-Rig for its work in this case. *See N.K. Parrish, Inc. v. Southwest Beef Industries Corp.,* 638 F.2d 1366, 1371–72 (5th Cir.), *cert. denied,* 454 U.S. 1047, 102 S.Ct. 587, 70 L.Ed.2d 488 (1981).

The contract specifically provided that repairs and alterations would be performed and that OHWC was to do same. Should we, then, by implication, presume that ETF authorized that same be done and accordingly, subject ETF to a possessory lien by Hydra-Rig? *Cf. City Nat. Bank v. Laughlin,* 210 S.W. 617, 619 (Tex.Civ.App.— Amarillo 1919, no writ). We realize that where liens or ownership interests are recorded, this would put persons furnishing labor and supplies on constructive notice of the lessor's reversionary interest. *Bethlehem Supply Corp. v. Wotola Royalty Corp.,* 140 Tex. 9, 165 S.W.2d 443, 445 (1942). It is undisputed that ETF did not undertake to place any identification on the rig and there was no provision for registration of snubbing rigs in this state as there is for motor vehicles and realty. Also, there was apparently little or no effort on the part of ETF to keep up with the location or status of the rig for a period of several months. Additionally, ETF benefitted from the services rendered by Hydra-Rig and the improvements made on the rig (as evidenced by the testimony of how said alterations increased the value and reduced the maintenance cost and improved the rig's ability to do the work for which it was

designed). If we stop our inquiry with the foregoing considerations, we would be required to find a lien in Hydra-Rig. However, the inquiry does not stop at this point.

We are required to disregard part of this evidence if we find that the trial court's findings are supported by any evidence of probative value. *See Brown v. Frontier Theatres, Inc.*, 369 S.W.2d 299, 301 (Tex. 1963). Where there is evidence of probative force to support the findings and the judgment of the trial court, we are required to be controlled thereby. *Heard v. City of Dallas*, 456 S.W.2d 440, 443 (Tex. Civ.App.—Dallas 1970, writ ref'd n.r.e.) Does the record in this case contain some evidence of probative force that supports the findings of the trial court? *See In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

The trial court had before it the testimony of Joe McAnally, Executive Vice President for Marketing of Hydra-Rig, in connection with what was said when the contacts were made relative to the work on the snubbing rig. We quote from the record as follows:

Q [APPELLANT'S ATTORNEY] Can you tell the Court how you got involved in working on this Patso unit—hydro unit.

A Yes. Troy telephoned me one day and mentioned that he was having trouble with his snubbing unit; he needed some help. He wasn't getting the help that he needed from the manufacturers and the help that he did get wasn't satisfactory and he wanted us—wanted me to send a man up to look at it that knew it and do the work for him.

Q So what did you do after that—after he contacted you?

A I asked John Maschek to go up there and take a look at the equipment.

\*   \*   \*   \*   \*   \*

Q Was there anything said to you about ownership of that Patso unit?

A No.

Q Did Mr. Rogers say anything to you to make you think that he owned it?

A Yes.

Q And what was that?

A When he called me to ask someone to come up and take a look at it and I questioned him about his Bowen unit, being that the Bowen unit he'd purchased was the very first unit that Bowen had ever manufactured, why he wanted to be the guinea pig, and he mentioned that Bowen had given him either six months or a year to—or two-year terms, I'm not sure, payout terms on the unit, and I assume that—He mentioned that he owned that unit and I would assume that he owned the other unit.

Q Did he request from you services of Hydra-Rig about the Bowen unit?

A He asked us to look at that unit, also, while we were up there, yes.

Q Do you recall how you found out about ETF Corporation?

A After several conversations with Troy, I believe in December after the unit had sat in our yard for three— two, three, four weeks, I asked him to come up and get it and we need to be paid for it. One or two of these conversations, he said just give me a little more time; just give me one more week, then finally he said, I'm having trouble and we have a lease-purchase agreement for our unit and I'm not sure if he told me who it was or not. But, he'd run into some trouble and he'd have to get back to us. That's the first time I was aware he had lease-purchased it and he did not purchase it outright from Patso.

■ In view of the record, we conclude that the trial court was justified in deciding that there was no express agency or for that matter, implied agency. The contract provided that OHWC was responsible for

making repairs and paying for same. The same contract also provided that OHWC had the right to make alterations, additions or improvements as long as the value of the rig was not reduced. Such additions and improvements were to become the property of ETF and subject to the terms of the lease. We are left with the question of whether or not the trial court had sufficient evidence upon which to conclude that there was no apparent agency.

From the testimony of the vice president of Hydra-Rig, who initiated the proceedings and made the deal with OHWC, it appears that the conclusion he reached that the snubbing rig belonged to OHWC was based on the fact that another rig, the Bowen rig, was the property of OHWC. The conclusion therefore was based upon a factor over which ETF had no control nor any responsibility insofar as the Bowen rig was concerned. We therefore hold that the trial court had testimony to conclude that there was no apparent agency involved in this case.

We overrule points of error one through six for the reason that the trial court did not err in making findings of fact nos. 9 and 11, because an agency was not established as a matter of law as between OHWC and ETF, either expressly, impliedly, or apparently. Inasmuch as the trial court had testimony on which it could hold that agency was not established as alleged, the judgment of the court holding no liability on ETF for damages or attorneys' fees was not incorrect.

We sustain points of error seven and eight for the reason that the testimony conclusively shows that ETF did receive benefit from the alterations involved. However, because of the matter of agency having been ruled upon by the trial court as not having been established, we perceive no error as would cause the reversal of the case.

We affirm the judgment of the trial court.