United States Court of Appeals,

Fifth Circuit.

No. 95-30941.

In the Matter of CAJUN ELECTRIC POWER COOPERATIVE, INCORPORATED, Debtor.

UNITED STATES of America, on Behalf of the RURAL UTILITIES SERVICE, Appellant,

v.

CAJUN ELECTRIC POWER COOPERATIVE, INCORPORATED;  Louisiana Public Service Commission;  Concordia Electric Cooperative, Inc.;  Dixie Electric Membership Corporation;  Valley Electric Membership Corporation;  Pointe Coupee Electric Membership Corporation; Washington St. Tammany;  Teche Electric Cooperative, Inc.;  South Louisiana Electric;  Northeast Louisiana Power Cooperative, Inc.; Claiborne Electric Cooperative, Inc.;  Jefferson Davis Electric Cooperative, Inc.;  Beauregard Electric Cooperative, Inc.; Southwest Louisiana Electric Membership Corporation;  Cajun Electric Members Committee, Appellees.

April 9, 1997.

Appeal from the United States District Court for the Middle District of Louisiana.

Before BENAVIDES, STEWART and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

Under the Rural Electrification Act of 1936, as amended, 7 U.S.C. § 901 *et seq.,* ("RE Act") the Secretary of Agriculture ("Secretary") is empowered to make and guarantee loans to wholesale power supply borrowers that generate electric energy for retail electrical systems which furnish electricity to persons in rural areas.  The principal issue in the present case is whether the RE Act authorizes the Secretary by regulation to (1) pre-empt a state regulatory agency's jurisdiction over a borrower's rates if the Secretary determines that the borrower has failed to pay as

1

required on loans made or guaranteed pursuant to the RE Act and that the borrower's rates are inadequate to permit it to do so; and (2) require the borrower to establish rates sufficient to satisfy the loan requirements. Alternatively, we are asked to decide whether the RE Act, under the circumstances of this case, implicitly pre-empts state ratemaking jurisdiction.

The Secretary (through the Rural Utilities Service ("RUS") of the Department of Agriculture), pursuant to 7 C.F.R. § 1717.300 *et seq.*, notified a power supply borrower, Cajun Electric Cooperative Corporation ("Cajun"), and the Louisiana Public Service Commission ("LPSC") that Cajun had failed to pay as required, Cajun's rates were found to be inadequate, the LPSC's jurisdiction over Cajun's rates was pre-empted, and Cajun was required to immediately establish rates sufficient to satisfy the requirements of its RE Act loans. Cajun brought this action for a declaratory judgment to decide whether it must comply with the Secretary's regulation or the state commission's rate order. The District Court held that the LPSC rate order was not pre-empted because the Secretary's regulation was invalid. We affirm.

By enacting and amending the Rural Electrification Act of 1936 (RE Act), 7 U.S.C. § 901 *et seq.*, Congress did not authorize the Secretary to pre-empt the jurisdiction of a state regulatory authority over a power supply borrower's rates for the purpose of raising the rates and revenues of the borrower to enable it to make payments on loans made or guaranteed pursuant to the RE Act. The RE Act does not expressly authorize the Secretary to regulate the

2

rates of power supply borrowers. If the Act delegates that power implicitly, it requires the Secretary to exercise it comprehensively to further the primary purpose of the statute, *i.e.,* to provide rural America with low cost electricity, and to fix just and reasonable rates after balancing the consumer and other interests involved. The RE Act itself does not implicitly pre-empt the LPSC's ratemaking jurisdiction under the circumstances of this case.

BACKGROUND

In 1936 Congress enacted the Rural Electrification Act ("RE Act"), presently codified at 7 U.S.C. § 901 *et seq.,* empowering the Rural Electrification Administration ("REA"), an independent federal agency, to provide rural America with low cost electricity and telephone service by lending funds to rural electric and telephone systems directly at below market interest rates. *See, e.g., Morgan City v. South Louisiana Elec. Coop., Ass'n.* 31 F.3d 319, 322 (5th Cir.1994), *reh'g denied* 49 F.3d 1074 (5th Cir.), *cert. denied,* --- U.S. ----, 116 S.Ct. 275, 133 L.Ed.2d 196 (1995); *Alabama Power Co. v. Alabama Electric Co-op. Inc.,* 394 F.2d 672, 677 (5th Cir.1968), *reh'g denied,* 397 F.2d 809 (5th Cir.), *cert. denied,* 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465 (1968); *Wabash Valley Power Ass'n., Inc. v. Rural Electrification Administration,* 988 F.2d 1480, 1490 (7th Cir.1993); *Public Utility Dist. No. 1 of Pend Oreille County v. United States,* 417 F.2d 200 (9th Cir.1969); *Salt River Project Agr., Imp. & Power Dist. v. Federal Power Comm.,* 391 F.2d 470, 473 (D.C.Cir.1968). In 1939, pursuant to the

3

Reorganization Plan No. 2 of 1939, the REA was transferred to the Department of Agriculture and was placed under the supervision and direction of the Secretary of Agriculture. 5 U.S.C. § 903. The REA was later renamed as the Rural Utilities Service ("RUS") by the Federal Crop Insurance Reform and Department of Agriculture Reorganization Act of 1994. In response to the RE Act and its precursor Executive Branch order, cooperative electrical systems were formed to seek government subsidized loans and deliver electricity to rural consumers. Concomitantly, groups of rural electrical cooperative systems formed central generation and transmission cooperatives ("G & Ts") which also borrow under the RE Act for the purpose of generating and purchasing electric energy for sale at wholesale to their respective rural electrical cooperative members that retail electricity to ultimate consumers. *See, e.g., Morgan City,* 31 F.3d at 322.

Cajun Electrical Cooperative Corporation ("Cajun") is a G & T cooperative that provides wholesale electricity to 12 rural retail cooperative owner-members. Cajun's retail cooperative members, Beauregard Electric Coop., Inc., Claiborne Electric Coop., Inc., Concordia Electric Coop., Inc., Dixie Electric Coop., Inc., Jefferson Davis Electric Coop., Inc., Northeast Louisiana Electric Coop., Inc., Pointe Coupee Electric Membership Corp., South Louisiana Electric Coop. Association, Southwest Louisiana Electric Membership Corp., Teche Electric Coop., Inc., Valley Electric Membership Corp., and Washington-St. Tammany Electric Coop., Inc., provide electricity to one million ultimate consumers in areas

comprising 80% of Louisiana lands.

In 1979, Cajun, at the behest of the REA, purchased a 30% interest in Gulf States Utilities Co.'s unfinished River Bend nuclear power plant in St. Francisville, Louisiana. In 1981, the REA loaned Cajun $1.6 billion to finance Cajun's investment in River Bend. Before approving the loan, the REA conducted site visits at River Bend, reviewed cost and other data submitted by GSU and others, and provided Cajun with financial and technical assistance and advice. The REA, and subsequently the Secretary, have required, as a condition to making or guaranteeing any loans to power supply borrowers, that the borrower enter into wholesale power contracts with its several members and assign and pledge the contracts as security for the repayment of the loans. 7 C.F.R. § 1717.301. *See, e.g., Fuchs v. Rural Electric Convenience Co-op.,* 858 F.2d 1210 1212 n. 8 (7th Cir.1988), *cert. denied,* 490 U.S. 1020, 109 S.Ct. 1744, 104 L.Ed.2d 181 (1989).

Article IV, § 21(B) of The Louisiana Constitution of 1974 provides that the Louisiana Public Service Commission ("LPSC") "shall regulate all common carriers and public utilities and have such other regulatory authority as provided by law." The LPSC, however, did not assert its constitutional jurisdiction over Cajun as a public utility until September 3, 1987, when it initiated an examination of Cajun's rates and the prudence of Cajun's River Bend nuclear generator investment. On September 30, 1987, Cajun and other nonprofit electrical cooperatives brought suit against the LPSC seeking declaratory judgment that they were not public

utilities within the meaning of Article IV, § 21(B) of the state constitution and that statutes removing the LPSC's authority over them were constitutional. The trial court declared that laws exempting the cooperatives from regulation were unconstitutional. The Supreme Court of Louisiana held that Article IV, § 21(B) of the state constitution delegated to the LPSC the plenary legislative power to regulate and make rates for all public utilities and that Cajun and the other electrical cooperatives were utilities for purposes of the constitutional provision. *Cajun Elec. Power Coop., Inc. v. Louisiana Public Service Commission,* 544 So.2d 362 (La.1989)(on rehearing), *cert. denied,* 493 U.S. 991, 110 S.Ct. 538, 107 L.Ed.2d 536 (1989); *see also, Cajun Elec. Power Coop., Inc. v. Louisiana Public Service Commission* 532 So.2d 1372 (1988)(original opinion vacated on rehearing).

In 1987, Cajun defaulted on its RE Act loans and began debt restructuring negotiations. On May 31, 1990, Cajun and the REA entered a debt restructuring agreement ("DRA"), dividing the debt into note A of $2,147,994,670 and note B of $1,037,007,550, subject to LPSC approval. On July 20, 1990, the LPSC approved the DRA, subject to the conditions that the LPSC retained jurisdiction to determine the justness and reasonableness of Cajun's rates and services, the LPSC was not required to set rates at any particular level, the LPSC was not committed to set rates at a level sufficient to meet the debt service payments provided by the DRA, and the appropriate rates for Cajun would depend on ratemaking considerations that could not be considered in the expedited

6

proceeding. The LPSC authorized 54.5 mills as the maximum average rate for Cajun through December 31, 1991, subject to any ratemaking adjustments ordered by the LPSC as a result of rate investigation. Nevertheless, by December 20, 1994, despite the payment of $450 million pursuant to the DRA, Cajun's RE Act debt increased by $ 1 billion (to $4.2 billion) as a result of accrued but deferred interest.

On December 16, 1994, the LPSC entered a rate order directing Cajun by December 21, 1994 to reduce its annual revenues by $30.23 million and its average rates from 54.4 mills to 48.81 mills. The rate order was based on studies and analyses from which the LPSC determined that Cajun's investment in the River Bend nuclear generator project was imprudent and that Cajun's interest in River Bend was not used and useful under traditional regulatory principles. The LPSC found that *inter alia* allowing recovery of the River Bend investment would have catastrophic effects upon Cajun's member cooperatives and the rural economy of the state. Accordingly, the LPSC ordered that the River Bend investment must be excluded from Cajun's rate base.

The Secretary (acting through RUS) on December 20, 1994 notified Cajun that the rate order was pre-empted by federal law. On December 21, 1994, Cajun filed (1) a new tariff in accordance with the LPSC rate order; (2) a petition for relief under Chapter 11 bankruptcy; and (3) the present suit for declaratory judgment as to whether the Secretary or the LPSC had jurisdiction over Cajun's rates. Cajun's members intervened in support of the

7

District Court's judgment, asserting additionally that the Secretary's pre-emption regulations violate the Bankruptcy Code. We pretermit the bankruptcy issue because we conclude that the Secretary was not authorized to pre-empt the LPSC's ratemaking jurisdiction or to raise Cajun's rates to facilitate RE Act debt collections. The Secretary filed a third-party complaint seeking a declaration that the LPSC's ratemaking jurisdiction over Cajun is pre-empted by federal law.

After motions had been filed by the parties, the district court granted summary judgment in favor of the LPSC, holding that neither the RE Act nor the Secretary's regulations expressly or impliedly pre-empt the LPSC's rate order. The Secretary appealed.

### DISCUSSION

The pre-emption doctrine, which is derived from the Supremacy Clause, U.S. Const., Art. VI, cl. 2, requires us to examine congressional intent. *Fidelity Federal Sav. and Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 152, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982). Pre-emption may be either express or implied, and "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Jones v. Rath Packing Co.,* 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). Without explicit pre-emptive language in the relevant statute, congressional intent to displace state law may be inferred because the "[t]he scheme of federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it,"

8

because "the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or because "the object sought to be obtained by federal law and the character of obligations imposed by it may reveal the same purpose." *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947).

Even where Congress has not totally supplanted a state law, the state law is voided to the extent that it directly conflicts with federal law. *de la Cuesta,* 458 U.S. at 153, 102 S.Ct. at 3022. This type of conflict arises when "compliance with both federal and state regulations is a physical impossibility." *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142-143, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963); or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

Federal regulations have no less pre-emptive effect than federal statutes. *City of New York v. F.C.C.,* 486 U.S. 57, 63, 108 S.Ct. 1637, 1641-42, 100 L.Ed.2d 48 (1988); *Louisiana Public Service Comm'n v. F.C.C.,* 476 U.S. 355, 368, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986); *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984); *de la Cuesta,* 458 U.S. at 153-154, 102 S.Ct. at 3022-23 In general, where "Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine

9

whether he has exceeded his statutory authority or acted arbitrarily." *Id.; United States v. Shimer,* 367 U.S. 374, 381-382, 81 S.Ct. 1554, 1559-60, 6 L.Ed.2d 908 (1961). Regulations seeking to pre-empt state law, are subject to the following judicial scrutiny:

> "If [h]is choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."

*de la Cuesta,* 458 U.S. at 154, 102 S.Ct. at 3022-23 (quoting *Shimer,* 367 U.S. at 383, 81 S.Ct. at 1560-61). *See also Blum v. Bacon,* 457 U.S. 132, 145-146, 102 S.Ct. 2355, 2363-64, 72 L.Ed.2d 728 (1982); *Ridgway v. Ridgway,* 454 U.S. 46, 57, 102 S.Ct. 49, 56, 70 L.Ed.2d 39 (1981)(regulations must not be "unreasonable, unauthorized, or inconsistent with" the underlying statute); *Free v. Bland,* 369 U.S. 663, 668, 82 S.Ct. 1089, 1093, 8 L.Ed.2d 180 (1962).

Consequently, the primary questions upon which resolution of this case rests are whether the Secretary meant to pre-empt the LPSC's rate order, and, if so, whether that action is within the scope of the Secretary's delegated authority.

The Secretary's intent to pre-empt the rates set for Cajun by the LPSC is unambiguous. The regulations on "Federal Pre-emption in Rate Making in Connection With Power Supply Borrowers" promulgated by the Secretary, 7 C.F.R. §§ 1717.300-309, in pertinent parts, provide:

**§ 1717.305 Pre-emption.**

10

**(a)** *Inadequate rates.* State regulatory authority jurisdiction over a power supply borrower's rates shall be pre-empted by the RE Act if the Administrator shall have determined that the borrower's rates approved by the state regulatory authority are, after taking into account the borrower's costs and expenses, inadequate to produce revenues sufficient to permit the borrower to make required payments on its secured loans and the borrower has failed to make required payments on its secured loans.

**(b)** *Public Notice.* The Administrator shall:

(1) Notify the borrower and the state regulatory authority in writing of the determination, indicating the jurisdiction of the state regulatory authority over the rates of the borrower has been pre-empted pursuant to this part and the borrower shall henceforth establish its rates in accordance with the term of the REA documents.

\* \* \* \* \* \*

## § 1717.306 REA required rates.

(a) Upon the publication in the FEDERAL REGISTER of the notice of pre-emption of state regulatory authority as provided in this subpart, REA will exercise exclusive jurisdiction over the rates of the borrower pursuant to the terms of the REA documents. The borrower shall immediately establish rates with the approval of REA that are sufficient to satisfy the requirements of the REA wholesale power contract and other REA documents described in § 1717.303 of this subpart. The borrower shall establish such rates notwithstanding any provision of the REA documents referring to such laws, rules, orders or actions.

\* \* \* \* \* \*

The regulations plainly provide that state regulatory jurisdiction over a power supply borrower's rates shall be pre-empted when the Secretary determines that the borrower's rates set by the state regulatory authority are inadequate to produce revenues to permit the borrower to make required payments on its secured loans and the borrower has in fact failed to make such payments. *Id.* § 1717.305(a). Furthermore, the regulations also provide that, upon pre-emption, the Secretary will exercise

11

exclusive jurisdiction over the rates of the borrower and that the borrower shall immediately establish rates with the approval of the Secretary that are sufficient to satisfy the requirements of the loans made or guaranteed pursuant to the RE Act.

It remains to be seen, however, whether the Secretary acted nonarbitrarily within his statutory authority in issuing the pre-emption regulations. The Rural Electrification Act of 1936 ("RE Act"), as amended, 7 U.S.C. § 901 *et seq.,* authorizes and empowers the Secretary of Agriculture (A) to make loans for (1) rural electrification and the furnishing of electric energy to persons in rural areas who are not receiving central station service, (2) furnishing and improving electric and telephone service in rural areas, and (3) assisting electric borrowers to implement demand side management, energy conservation programs, and on-grid and off-grid renewable energy systems; (B) to promote studies, investigations, and reports concerning the condition and progress of the electrification of and the furnishing of telephone service in rural areas; and to publish and disseminate information with respect thereto, § 902(a); (C) to issue interim regulations to implement the authority contained in § 902(a) to make loans to implement demand side management, energy conservation programs, and on-grid and off-grid renewable energy systems, § 902(b); and (D) to make loans to finance the construction and operation of generating plants, electric transmission and distribution lines or systems for the furnishing of electric energy to persons in rural areas who are not receiving central stations service and for the

12

furnishing and improving of electric service to persons in rural areas, § 904.

The RE Act plainly does not expressly empower or authorize the Secretary to pre-empt the jurisdiction of a state regulatory agency or to regulate the rates of a power supply borrower. The language and history of the RE Act convince us that, if Congress implicitly delegated to the Secretary any power to pre-empt state jurisdiction or to fix rates, the Act does not authorize the Secretary to do so with the narrow objective of raising a borrower's rates and revenues for the purpose of satisfying the requirements of the borrower's RE Act loan obligations.

There are reasons to doubt that the Secretary is authorized to pre-empt state ratemaking power or to fix borrowers' rates for any purpose. As the Supreme Court observed, "[n]othing in the Rural Electrification Act expressly pre-empts state rate regulation of power cooperatives financed by the REA" and "the REA is a lending agency rather than a classic public utility regulatory body in the mold of either FERC or the Arkansas PSC." *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n,* 461 U.S. 375, 385-386, 103 S.Ct. 1905, 1913, 76 L.Ed.2d 1 (1983). The Court further noted that "the legislative history ... makes abundantly clear ... that, although the REA was expected to play a role in assisting the fledgling rural power cooperatives in setting their rate structures, it would do so within the constraints of existing state regulatory schemes." Id. at 386, 103 S.Ct. at 1913, (citing 80 Cong.Rec. 5316 (1936)(Rep.Lea); Hearing on S. 3483 before the

13

House Committee on Interstate and Foreign Commerce, 74th Cong., 2d Sess., 30, 37, 51, 52 (1936)). Moreover, the Supreme Court pointed to REA Bulletin 111-4, at 1-2 (1972) which stated that "[b]orrowers must, of course, submit proposed rate changes to any regulatory commissions having jurisdiction and must seek approval in the manner prescribed by those commissions." *Id.* at 387-388, 103 S.Ct. at 1914. In light of these factors, the Court acknowledged, "an argument might be made that state rate regulation of rural power cooperatives engaged in sales for resale is not only not pre-empted, but is indeed affirmatively authorized by the Rural Electrification Act." *Id.* at 388 n. 15, 103 S.Ct. at 1914 n. 15. On balance, however, the Court concluded, Congress and the Secretary most likely "intended no more than to leave in place state regulation otherwise consistent with the requirements of the Commerce Clause." *Id.*

The developments subsequent to *Arkansas Elec.* raise fresh doubts about inferring a Congressional intent to delegate to the Secretary the authority to pre-empt state ratemaking jurisdiction. The enormously unprofitable RE Act loans for nuclear generators magnify the Secretary's interest and concerns as a creditor and appear to impair his eligibility as a fair and impartial ratemaker. Consequently, it is difficult to conceive that Congress would sanction the Secretary's displacement of state regulatory authority under the circumstances of the present case.

Nevertheless, the Supreme Court in *Arkansas Elec.* left the question partly open by adding an admonitory dictum evidently

14

designed to deter state regulatory agencies from engaging in unprincipled ratemaking at the expense of the federal government. The Court suggested what it might decide under two hypotheses:

> "There may come a time when the REA changes its present policy, and announces that state rate regulation of rural power cooperatives is inconsistent with federal policy. If that were to happen, and if such a rule was valid under the Rural Electrification Act, it would of course pre-empt any further exercise of jurisdiction by the Arkansas PSC. Similarly, as Arkansas already recognizes, the PSC can make no regulation affecting rural power cooperatives which conflicts with particular regulations promulgated by the REA. Moreover, even without an explicit statement from the REA, a particular rate set by the Arkansas PSC may so seriously compromise important federal interests, including the ability of the AECC to repay its loans, as to be implicitly pre-empted by the Rural Electrification Act. We will not, however, in this facial challenge to the PSC's mere assertion of jurisdiction, assume that such a hypothetical event is so likely to occur as to preclude the setting of any rates at all."

*Id.* at 389, 103 S.Ct. at 1915 (citations omitted).

We cannot derive much guidance from the passage in the present case, however. First, it has the distinctive earmarks and weaknesses of dictum, i.e., it "could have been deleted without seriously impairing the analytical foundations of the holding—[and], being peripheral, may not have received the full and careful consideration of the court that uttered it." *Sarnoff v. American Home Products Corp.*, 798 F.2d 1075, 1084 (7th Cir.1986)(Posner, J.) Moreover, it is ambiguous and may not be relevant here at all. The first hypothesis assumes a change in policy—"if such a rule was valid under the [RE Act]." *Arkansas Elec.*, 461 U.S. at 389, 103 S.Ct. at 1915—under which the Secretary pre-empts all state regulation of power supply borrowers and undertakes comprehensive federal rate regulation, rather than

15

displacing individual rate orders on an ad hoc basis. The Secretary concedes that his regulations purporting to pre-empt a particular state's ratemaking jurisdiction and to index a particular borrower's rates with its RE Act debt payment obligations do not constitute "ratemaking" at all, much less comprehensive ratemaking. The second hypothetical situation evidently refers to an unreasonable and unjust rate that is the product of improper or unprincipled state ratemaking, i.e., a particular rate that may "so seriously compromise important federal interests, including the ability of the [borrower] to repay its loans, as to be implicitly pre-empted by the [RE Act]." *Id.* The record designated for our review does not reflect improper ratemaking or a failure to establish just and reasonable rates; and the dictum does not necessarily indicate that the important federal interests in just and reasonable rates and low cost electricity for rural America should be seriously compromised for the sake of enabling a power supply borrower to repay its government loans.

Assuming arguendo, however, that the RE Act impliedly authorizes and empowers the Secretary, under some circumstances, to pre-empt the jurisdiction of a state public utilities commission and exercise ratemaking power over an RE Act borrower's rates, we conclude that the Act does not authorize the types of pre-emption and rate fixing at issue in the present case. The uncontested primary purpose of the RE Act is to "bring[ ] abundant, low cost electric energy to rural America." *Alabama Power Co. v. Alabama*

16

*Elec. Co-op., Inc.,* 394 F.2d 672, 677 (5th Cir.1968), *reh'g denied,* 397 F.2d 809 (5th Cir.), *cert. denied,* 393 U.S. 1000, 89 S.Ct. 488, 21 L.Ed.2d 465 (1968) (quoting from *Dairyland Power Coop.,* 37 F.P.C. 12, 18, 35 L.W. 2385 (1967)). *Accord, Morgan City v. South Louisiana Elec. Coop. Ass'n.,* 31 F.3d 319, 324 (5th Cir.1994), *reh'g denied,* 49 F.3d 1074 (5th Cir.), *cert. denied,* --- U.S. ----, 116 S.Ct. 275, 133 L.Ed.2d 196 (1995)(federal purpose of providing low cost, reliable electric service to rural areas); *Wabash Valley Power Ass'n., Inc. v. Rural Electrification Admin.,* 988 F.2d 1480, 1490 (7th Cir.1993)(the REA promotes and facilitates investment in electricity ... for rural areas in order to ensure that these regions receive power at reasonable prices); *Public Utility Dist. No. 1 of Pend Oreille County v. United States,* 417 F.2d 200 (9th Cir.1969). *See also, Salt River Project Agr., Imp. & Power Dist. v. FPC,* 391 F.2d 470, 473 (D.C.Cir.1968)("The [REA's] objective was to provide electricity to those sparsely settled areas which the investor-owned utilities had not found it profitable to service."). The rate-making process requires the fixing of just and reasonable rates and involves the balancing of the investor and the consumer interests. *See Federal Power Commission. v. Hope Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1943); *Jersey Cent. Power & Light v. F.E.R.C.,* 810 F.2d 1168, 1177-78 (D.C.Cir.1987)(*en banc* ). *See also, Wabash Valley Power Ass'n. Inc. v. Rural Electrification Admin.,* 903 F.2d 445, 448 (7th Cir.1990)( [P]erhaps the "real" owners—at least the effective controllers—of an electric co-op are the debt investors, who would

17

be tempted to raise prices past the competitive level in order to make their loans more safe or hike up the rate of interest.)

If the RE Act implicitly delegates pre-emption and ratemaking powers to the Secretary, it must be presumed that Congress intended for the Secretary to use the powers to make and apply regulations in conformity with the purpose of the Act and the principles of ratemaking. In other words, the Secretary is required to use such powers in furtherance of the RE Act's purpose of bringing abundant, low cost electric energy to rural America—or at least to seek a reasonable accommodation of this primary goal and any momentarily conflicting subsidiary policy; and the Secretary is obliged in exercising any ratemaking power to balance the consumer and investor or creditor interests in the fixing of just and reasonable rates.

It is evident, therefore, that in the present case the Secretary's regulations and actions did not comport with ratemaking principles or the principal RE Act purpose. Instead, the pre-emption and rate fixing measures were taken solely for debt collection purposes and without any consideration of their impact on the goals of affording low cost electricity to the consumer or of balancing his interest with that of the investor or creditor to establish a just and reasonable rate. We do not believe Congress intended to authorize the Secretary to fix a power supply borrower's rates to be passed on to consumers by mechanistically tying them to whatever charge per unit is necessary to raise revenues sufficient to meet the requirements of loans made or

18

guaranteed pursuant to the RE Act. Consequently, it is clear that the Secretary exceeded his statutory authority or acted arbitrarily in promulgating and applying the pre-emption and rate indexation regulations. *Accord, Wabash Valley Power Ass'n. v. Rural Electrification Admin.,* 988 F.2d 1480, 1491 (7th Cir.1993)("The REA has not identified a source of authority in either the express language or the purpose and operation of the RE Act to justify its pre-emption regulations.... [I]t is clear that the REA may not dictate who shall bear the risk because that would amount to the agency conferring power on itself.").

Nor are we persuaded by appellant's alternative argument based on the Supreme Court's dictum in *Arkansas Elec*. The Secretary contends that the rate set for Cajun by the LPSC so seriously compromises important federal interests, including Cajun's ability to repay its loans, as to be implicitly pre-empted by the RE Act. The argument, however, bases its conclusion on assumptions that are as much in need of proof or demonstration as the conclusion itself. Although it may reasonably be assumed that the subsidiary federal interest in debt collection will not be strongly promoted by the LPSC-set rates, it can as plausibly be assumed that the federal interest of primary importance under the RE Act—affordable electric energy for rural consumers—would be seriously compromised by the increased consumer rates that would be required by the Secretary's pre-emption and rate escalation regulations. Also, it bears elaborating, the record presented with this appeal does not demonstrate that the LPSC acted arbitrarily or improperly, that the

19

rates established for Cajun were unjust or unreasonable, or that the rates were less just or reasonable than rates that would have been fixed by any other fair and impartial ratemaker balancing the consumer, creditor and investor interests.

Accordingly, the District Court's judgment declaring that the jurisdiction of the LPSC over Cajun's rates is not pre-empted and that Cajun must comply with the LPSC rate order rather than the Secretary's pre-emption regulations or notices is AFFIRMED.

STEWART, Circuit Judge, concurs in the judgment only.