IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-10149
_____

ASTRAEA AVIATION SERVICES, INC., doing
business as Dalfort Aviation,

                              Plaintiff - Appellant-Cross-Appellee,

                    versus

NATIONS AIR INC., ET AL.,

                                        Defendants,

9 LIVES HOLDING, INC.,

                    Defendant - Appellee-Cross-Appellant.
_____

        Appeals from the United States District Court for the
                    Northern District of Texas
_____
                        April 27, 1999
Before KING, Chief Judge, REYNALDO G. GARZA and JOLLY, Circuit
Judges.

E. GRADY JOLLY, Circuit Judge:

        The main issue presented by this appeal is whether § 70.301 of

the Texas Property Code requires a mechanic to obtain the consent

of an aircraft's owner to perform work before the mechanic can

secure a lien on the aircraft.  Astraea Aviation Services, Inc.

d/b/a Dalfort Aviation ("Dalfort")--a company that provides

aircraft maintenance and repair services--asserted a lien on an

aircraft and brought a foreclosure suit against the owner of the aircraft. Dalfort now appeals from a judgment denying the existence of a lien. Dalfort also appeals the decision to assess attorney's fees against, rather than in favor of, Dalfort under Tex. Prop. Code Ann. § 70.306 (West 1995). The owner of an aircraft serviced by Dalfort, 9 Lives Holding, Inc. ("9 Lives"), cross-appeals the magistrate judge's denial of recovery on two of 9 Lives' counterclaims. We conclude that the magistrate judge correctly interpreted § 70.301 to require an owner's consent, and we also agree that the judge granted appropriate relief to 9 Lives on its counterclaims. We therefore affirm the judgment in all respects.

I

We review a trial court's findings of fact for clear error. Fed. R. Civ. P. 52(a). After reviewing the record, we conclude that the district court did not clearly err in any of its relevant findings of fact. We will therefore state the facts (some of which remain disputed) according to the findings of the district court.

9 Lives owns an aircraft described as a Boeing 737-200 bearing tail number N308VA. 9 Lives leased this aircraft to Viscount Air Services, Inc. ("Viscount"),[1] who in turn entered a sublease

---

[1]Viscount filed for bankruptcy while this appeal was pending, but Viscount is not a party in this appeal. The district court dismissed all claims against Viscount without prejudice.

agreement with Nations Air, Inc. ("Nations Air"). The lease agreement placed certain maintenance responsibilities on the lessee (Viscount), and the sublease agreement passed those responsibilities on to the sublessee (Nations Air).

In August 1995, during the term of the sublease, Nations Air entered an agreement with Dalfort in which Dalfort agreed to perform maintenance and inspection work on the aircraft. After learning of this arrangement, but before Dalfort began any of its work, 9 Lives expressed to both Nations Air and Dalfort its disapproval of having Dalfort perform the work. 9 Lives told Dalfort that it would not consent to having Dalfort perform any work on the aircraft. After 9 Lives refused to give its consent (as owner), Dalfort nevertheless performed maintenance and inspection work. Upon completing the work, Dalfort sent Nations Air an invoice for $191,903.82.[2] Although Nations Air conceded that it was liable for the full cost of the repairs, neither Nations Air nor 9 Lives paid Dalfort for any of its services or expenses.[3]

---

[2]Dalfort charged $166,804.17 for maintenance and inspection services and charged $25,099.65 for fuel, telephone costs, and other miscellaneous expenses.

[3]The district court entered judgment against Nations Air for the full $191,903.82. Nations Air is not, however, a party in this appeal.

Without having received any payment, Dalfort released the aircraft to Nations Air on August 25, 1995. Viscount terminated its contract with Nations Air in October, 1995, and took possession of the aircraft. A little later in the same month, Dalfort asserted its right to a lien on the aircraft by filing an affidavit with the Federal Aviation Administration ("FAA"). Then, in November 1995, Dalfort sued 9 Lives, seeking to force foreclosure on Dalfort's claimed mechanic's lien for the amount owed due to maintenance performed on the aircraft. 9 Lives asserted several counterclaims based on theories of conversion and Dalfort's alleged creation of a cloud on 9 Lives title to the aircraft.[4]

II

The district court asserted subject matter jurisdiction over the case under 28 U.S.C. § 1332. In September 1996, the parties tried their case before a magistrate judge. Dalfort argued that Texas law created a mechanic's lien on the aircraft under the following property code section:

A person who repairs or performs maintenance work on an aircraft has a lien on the aircraft for:

(1) the amount due under a contract for the repairs or maintenance work; or

(2) if no amount is specified by contract, the reasonable and usual

---

[4]The parties brought various other claims and counterclaims in the district court, but the parties have only appealed those mentioned.

4

> compensation for the repairs or maintenance work.

Tex. Prop. Code Ann. § 70.301 (West 1995).[5]  9 Lives did not challenge the application of Texas law to this case.

The magistrate judge concluded that § 70.301 does not create a lien without proof of the aircraft owner's consent to the services supporting the lien.  Acknowledging that no Texas court has ruled on this precise point of law, the magistrate judge reasoned that Texas courts would require the owner's consent because they have required such consent when interpreting similar mechanic's lien statutes.  Therefore, the magistrate judge concluded that Dalfort had no lien.  Furthermore, the magistrate judge awarded to 9 Lives reasonable attorney's fees under § 70.306 because it was a prevailing party.[6]

With respect to 9 Lives's counterclaims for conversion and creating a cloud on the aircraft's title, the magistrate judge noted that 9 Lives only claimed as damages lost rentals (allegedly caused by the cloud on the aircraft's title) and the attorney's

---

[5]The Texas legislature has since modified this statute and made the modifications effective as of August 28, 1995.  <u>See</u> Tex. Prop. Code Ann. § 70.301 (West Supp. 1999).  The modifications, however, would not play any relevant role in the issues of this case.

[6]Section 70.306 states the following:

> The court in a suit brought under this subchapter may award reasonable attorney's fees to the prevailing party.

5

fees incurred by defending against Dalfort's lawsuit. After noting that it would award 9 Lives its attorney's fees under § 70.306 (thus, making it unnecessary to award those fees as relief for 9 Lives's counterclaims), the district court refused to allow 9 Lives any further monetary recovery. The court concluded that 9 Lives did not make a sufficient showing that, but for the cloud on the title, it would have earned rentals by leasing the aircraft. Although it did not allow for recovery, the magistrate judge did grant some relief to 9 Lives in the cloud of title claim: The court's judgment declared "invalid the lien clam [sic] filed by Dalfort with the records of the Federal Aviation Administration." The judgment also provided that "9 Lives' title to the aircraft is quieted and cleared of any such lien claim by Dalfort."

Dalfort appeals from the judgment and contends that the magistrate judge erred in finding that Texas law did not create a lien. Dalfort also appeals the award of attorney's fees to 9 Lives because, if Dalfort prevails on this appeal as to the allowance of a mechanic's lien, then Dalfort is the prevailing party under § 70.306. 9 Lives cross-appeals the judgment and contends that the magistrate judge erred in failing to find that it sustained damages other than attorney's fees.[7]

---

[7]While this appeal was pending, 9 Lives filed a petition for bankruptcy under Chapter 11 of the Bankruptcy Code. The filing of this petition had the effect of staying the appeal. See 11 U.S.C. § 362(a). The bankruptcy court has since modified the stay so that

III

A

The issue presented is whether the district court erred in its interpretation of § 70.301 that a lien does not arise from § 70.301 unless the owner has given its consent to the work performed. We will review this question of law <u>de novo</u>. <u>See</u> <u>Branson v. Greyhound Lines, Inc.</u>, 126 F.3d 747, 753 (5th Cir. 1997).

B

Dalfort first argues that the plain language of the statute does not indicate that the owner must give its consent before a lien will be established. Section 70.301 states that "[a] person who . . . performs maintenance work on an aircraft <u>has a lien</u> on the aircraft . . . ." We should not, Dalfort argues, read additional terms into this plain language.

Dalfort acknowledges that other Texas cases have found a consent requirement in other mechanic's lien statutes. Dalfort points out, however, that the law governing mechanic's liens on aircraft has its own subchapter in Texas' Property Code. Accordingly, Dalfort contends that unique policy considerations support a decision to interpret § 70.301 differently from other mechanic's lien statutes. Dalfort's most prominent policy argument for a unique interpretation of § 70.301 is based upon the federal

_____

our court can rule in the instant appeal.

government's extensive regulation of aviation maintenance. Dalfort argues that this heavy federal regulation is important because the states could frustrate the goals of federal regulation by engrafting owner-consent as a condition to enforcement of their mechanic's lien statutes. The owner-consent requirement would, according to Dalfort, discourage required maintenance work by lessees. Dalfort further contends that the owner-consent would limit "the [aircraft] operator's ability to choose which shop to use for what work." In sum, Dalfort argues that to adopt an interpretation of § 70.301 that incorporates an owner-consent requirement would effectively permit Texas statutes to preempt FAA regulations (although no particular FAA regulation actually conflicts with a owner-consent requirement).

Finally, Dalfort presents an argument that owner consent was given, based on the lease and sublease contracts. According to this argument, 9 Lives gave consent--through the two agreements--to Nations Air to have maintenance performed.[8] Dalfort maintains that

---

[8]Under some situations, the sublease required Nations Air to obtain the owner's approval before allowing a particular mechanic to perform work on the aircraft. The specifics of these contract provisions, as well as the parties' disagreement over how we should interpret them, are ultimately irrelevant to our disposition of this appeal.

after giving this consent to Nations Air, 9 Lives could not withdraw its consent as to Dalfort.[9]

C

(1)

We begin our analysis of § 70.301 by noting that Texas courts have long interpreted Texas law to require an owner's consent before a mechanic can establish a lien against his property. See, e.g., Hydra-Rig, Inc. v. ETF Corp., 707 S.W.2d 288, 290 (Tex. Civ. App. 1986, writ refused n.r.e.) (interpreting Tex. Rev. Civ. Stat. Ann. art. 5503 (since repealed) and stating that "[r]epairs or improvements must have been authorized by the owners of a piece of property in order to give validity to a lien"); Southwestern Investment Co. v. Gilbreath, 380 S.W.2d 196, 197 (Tex. Civ. App. 1964, no writ) (an artisan must obtain an owner's consent to work before the artisan can establish a valid lien on an automobile); Drake Ins. Co. v. King, 606 S.W.2d 812, 818 (Tex. 1980) (citing Southwestern Investment Co. with approval).

This requirement applies not only to statutory liens, but to liens created by the Texas Constitution. The Texas Constitution provides the following:

---

[9]The parties also disagree over whether the sublease remained in effect. (9 Lives maintains that Nations Air had defaulted on the sublease.) This fact is also irrelevant to our disposition of this appeal.

9

>    Mechanics, artisans and material men, of every class,
>    shall have a lien upon the buildings and articles made or
>    repaired by them for the value of their labor done
>    thereon, or material furnished therefor; and the
>    Legislature shall provide by law for the speedy and
>    efficient enforcement of said liens.

Tex. Const. art. XVI, § 37.[10]  Like § 70.301, this provision in the Texas Constitution does not expressly provide that an owner's consent is required for the establishment of the lien.  Compare Tex. Const. art. XVI, § 37 ("Mechanics . . . <u>shall have a lien</u> . . . ."); <u>with</u> § 70.301 ("A person . . . <u>has a lien</u> . . . .").  Even so, Texas courts have interpreted the constitutional provision to require an owner's consent.  <u>See, e.g.</u>, <u>Sumrall v. Russell</u>, 255 S.W. 239, 240 (Tex. Civ. App. 1923, writ dism'd w.o.j.).

---

[10]For a general discussion of the distinction between liens created by statute and liens created by the Texas constitutional provision, see <u>A&M Operating Co. v. South Coast Supply Co., Inc.</u>, 182 B.R. 997, 1000–02 (E.D. Tex. 1995), <u>aff'd</u>, 84 F.3d 433 (5th Cir. 1996).  The <u>A&M Operating Co.</u> court summarized a century of Texas law surrounding the requirements to establishing a constitutional lien and notes that the constitutional lien exists independently and apart from any legislative act.  <u>Id.</u> at 1000; <u>see also</u> <u>First Nat'l Bank in Dallas v. Whirlpool Corp.</u>, 517 S.W.2d 262, 267 (Tex. 1974).  Although the constitutional provision is self-executing (and the liens it creates are automatic), the constitutional lien "is ineffective against a subsequent bona fide good faith purchaser for value without notice."  <u>A&M Operating Co.</u>, 182 B.R. at 1001.  The statutory lien provisions, in contrast, create a recordation system that shores up the lienholder's interest against all others.  Dalfort has not directed us to any legislative intent to drop the owner-consent requirement from the constitutional lien when the legislature enacted § 70.301.

The Sumrall case is particularly informative because there, as in the instant case, the party asserting the lien had not contracted with the owner, but with the lessee of the property. In Sumrall, a land lease agreement called for a twenty year lease during which the lessee was required to have a building constructed according to stated specifications. To fulfill the requirements of the lease agreement, the lessee contracted with the plaintiff to construct the building (as Nations Air similarly contracted with Dalfort to fulfill maintenance requirements on leased property). When the lessee failed to pay the plaintiff, the plaintiff brought a foreclosure action against the lessor-owner. The court held, however, that the Texas Constitution only provided for a lien on the lessee's leasehold estate; the plaintiff had no lien against the owner's property because the plaintiff did not contract with the owner. Sumrall, 255 S.W. at 240.[11]

Given the similarity between the language in § 37 and § 70.301, and the manner in which Texas courts interpret the former, we cannot accept Dalfort's "plain language" arguments. Indeed, we have been unable to locate any case in which a Texas court has found the existence of a lien without first concluding

---

[11]The court also found that nothing in the "lease contract between [the lessor and the lessee] constituted the latter the agent of the former." Sumrall, 255 S.W. at 240.

11

that the owner himself (or his agent[12]) gave consent to the performance of the services. Thus, Dalfort's argument cannot succeed by focusing on statutory text and other Texas authority alone.

(2)

Next, we turn to Dalfort's preemption argument. To persuade us that federal law[13] would preempt Texas law governing the establishment of aircraft liens (when that state law contains an owner-consent requirement), Dalfort must overcome the presumption against preemption. See, e.g., Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 132 (1978). With this presumption guiding our approach, we recount our own recent summary of federal preemption:

> Pre-emption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. Without explicit pre-emptive language in the relevant statute, congressional intent to displace state law may be inferred because the scheme of

---

[12]In this case, Dalfort cannot argue that the lease and sublease agreements created an apparent agency relationship between 9 Lives and Nations Air. 9 Lives explicitly told Dalfort--before Dalfort began servicing the aircraft--that it did not consent to Dalfort performing any work on the aircraft. This explicit denial of consent by the owner would destroy any apparent agency relationship that the leasing agreements might otherwise have created.

[13]The source of preemption is not limited to federal statutory law. Federal regulations can also preempt state law. See, e.g., In re Cajun Electric Power Coop., Inc., 109 F.3d 248, 254 (5th Cir. 1997).

12

federal regulation may be so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, because the Act of Congress may touch a field in which the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject, or because the object sought to be obtained by federal law and the character of obligations imposed by it may reveal the same purpose. Even where Congress has not totally supplanted a state law, the state law is voided to the extent that it directly conflicts with federal law. This type of conflict arises when compliance with both federal and state regulations is a physical impossibility or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

In re Cajun Electric Power Coop., Inc., 109 F.3d 248, 253-54 (5th Cir. 1997) (citations and quotation marks omitted).

Dalfort has pointed to no statute or regulation that directly conflicts with an owner-consent requirement in mechanic's lien statutes. Nor has Dalfort found, in either statutes or legislative history, any expressly stated congressional intent to preempt state law. Instead, Dalfort bases its argument on the notion that an owner-consent requirement will thwart the policy behind federal regulation of aircraft maintenance.

Dalfort correctly points out that the law governing interests in aircraft is undoubtedly an area of coincident federal and state regulation. In fact, federal law specifically contemplates this coincidence. For example, the U.S. Code section governing the "validity of conveyances, leases, and security instruments" involving aircraft contains the following choice of law provision:

13

> The validity of a conveyance, lease, or instrument that
> may be recorded under section 44107 of this title [which
> governs the recordation of security interests] is subject
> to the laws of the State . . . at which the conveyance,
> lease, or instrument is delivered . . . .

49 U.S.C.A. § 44108 (West 1997); see also Philko Aviation, Inc. v. Shacket, 462 U.S. 406, (1983) (stating that although federal law requires recordation of interests in aircraft before those interests can affect innocent third parties, state law determines the priority of those interests). Given the express recognition of state law in this area, it is clear that congressional intent cannot be inferred on grounds that the federal regulation is so pervasive that Congress left no room for the States to supplement it. Nor is the federal interest "so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." Although the Supremacy Clause of the U.S. Constitution requires us to make the preemption inquiry in cases involving areas where federal and state regulation coincide, we must also pay heed to the Supreme Court's admonishment that in "areas of coincident federal and state regulation, the teaching of [the Supreme Court's] decisions . . . enjoins seeking out conflicts between state and federal regulation where none clearly exists." Exxon Corp., 437 U.S. at 130 (citation and quotation marks omitted; ellipses in original).

Although requiring an owner's consent may place some additional burden upon a lessee seeking maintenance services for an

14

aircraft, the requirement does not (in and of itself) restrict the lessee's choice of mechanics. If the owner refuses to consent to having the work performed, the mechanic will simply be unable to secure a lien on the aircraft. The mechanic may still agree to perform the maintenance work, but he can only look to the lessee for payment. Thus, because the risk of nonpayment is greater, the owner-consent rule might effectively increase the cost of maintenance for lessees, but such a possibility, even if it were sure to occur, is too tenuous to support preemption. In sum, we are confident that no clear conflict exists between FAA regulations and an owner-consent requirement for the establishment of mechanic's liens. In the absence of a clear conflict, we will not strain to find one. See Exxon, 437 U.S. at 130.

Finally, we find no merit in Dalfort's argument that 9 Lives could not withdraw its consent that Dalfort contends was exhibited in the lease agreements. Any consent 9 Lives may or may not have given to Nations Air through the lease and sublease agreements cannot support the conclusion that Dalfort received consent from the aircraft's owner to perform maintenance work. 9 Lives expressly refused to give Dalfort consent. Although 9 Lives may have committed a breach of its lease agreement when it refused to give consent to Dalfort, that alleged breach injured Nations Air, not Dalfort. Dalfort was not a party to any contract with 9 Lives.

IV

15

We now turn to 9 Lives' cross-appeal. The magistrate judge found that 9 Lives did not sufficiently establish any damages resulting from conversion or from any cloud placed on the aircraft's title. After reviewing the testimony presented at trial, we conclude that the magistrate judge did not clearly err in finding that 9 Lives failed to establish damages (other than the attorney's fees already awarded under § 70.306). In his testimony, a director of 9 Lives stated that another party agreed to lease its aircraft, but that Dalfort's recordation of the lien delayed this agreement. According to this testimony, the delay caused 9 Lives to lose $125,000 in foregone rental payments. On cross-examination, however, Dalfort's attorney brought to the court's attention the conspicuous absence of any contract evidencing the new leasing agreement. Furthermore, 9 Lives did not present any other witnesses to testify to the existence of this agreement. We do not think the magistrate judge clearly erred in finding that 9 Lives failed to establish damages.

Finally, we will affirm the court's award of attorney's fees because 9 Lives clearly remains the prevailing party under § 70.306.

V

In summary, we conclude that Texas law did not create a lien on the aircraft under § 70.301. The magistrate judge did not clearly err in failing to find any damages, other than attorney's

16

fees, caused by wrongful conversion or a cloud on the aircraft's title.  Furthermore, the magistrate judge did not err in awarding attorney's fees to 9 Lives as the prevailing party.  For the foregoing reasons, the judgment is

A F F I R M E D.[14]

---

[14]We hereby GRANT the parties' joint motion to waive oral argument and have a decision entered.