# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————

No. 15-30514

————

United States Court of Appeals
Fifth Circuit

**FILED**

March 22, 2016

Lyle W. Cayce
Clerk

LORITA M. SAVOIE; MARCIA SAVOIE MEDLIN; CRAIG M. SAVOIE; TANIA SAVOIE ALEXANDER; RODNEY A. SAVOIE; GRETA SAVOIE BOUDOIN; DALE J. SAVOIE,

      Plaintiffs - Appellees

v.

HUNTINGTON INGALLS, INCORPORATED, formerly known as Northrop Grumman Shipbuilding, Incorporated, formerly known as Northrop Grumman Ship Systems, Incorporated, formerly known as Avondale Industries, Incorporated, formerly known as Avondale Shipyards, Incorporated, formerly known as Avondale Marine Ways, Incorporated; ALBERT L. BOSSIER, JR.; J. MELTON GARRETT; ONEBEACON AMERICA INSURANCE COMPANY, as Successor to Commercial Union Insurance Company and Employers Commercial Union Insurance Company; PENNSYLVANIA GENERAL INSURANCE COMPANY, formerly known as American Employers' Insurance Company,

      Defendants - Appellants

————

Appeal from the United States District Court
for the Eastern District of Louisiana

————

No. 15-30514

Before CLEMENT, GRAVES, and COSTA, Circuit Judges.

COSTA, Circuit Judge:

From 1952 through 1976, the great majority of ocean-going vessels built at Avondale Shipyard[1] in Louisiana fulfilled contracts from the federal government. The specifications for these Navy and Coast Guard vessels required asbestos insulation through at least 1968. In this lawsuit brought by survivors of a worker who allegedly contracted mesothelioma while working at the shipyard during this time, the question is whether strict liability claims based on the existence of asbestos at the shipyard give rise to federal jurisdiction under the federal officer removal statute.

**I.**

Joseph Savoie was employed at the shipyard between 1948 and 1996. During his tenure there, Savoie worked both as a clean-up laborer, which involved cleaning up various insulation materials, and as a painter–blaster on vessels the shipyard constructed for the Navy and Coast Guard. The contracts between the shipyard and the government listed numerous specifications, some of which mandated that the shipyard use asbestos in the vessels' thermal insulation. The Navy utilized a quality control system to ensure that the shipyard complied with all contractual requirements, and the shipyard was required to certify compliance for each stage of a particular vessel before the government would release even a single installment payment.

The Plaintiffs contend that although the government supervised the construction of the vessels to ensure that they were in compliance with the contractual requirements, the government did not control the shipyard's safety

---

[1] At the time Savoie was employed at the shipyard it was owned by Avondale. Avondale has a long history of different titles, but Huntington Ingalls, Inc. is the current successor in interest and one of the Defendants in this action. For clarity, we refer to Avondale and its successors as "the shipyard."

department.  The Defendants counter that the Navy inspectors were heavily involved in overseeing the construction process and had final control over any safety issues that arose.

Savoie ultimately contracted mesothelioma, allegedly as a result of asbestos exposure from working on these vessels.  Before his death, he filed this suit in state court.  He brought numerous negligence claims, such as failure to warn, failure to take reasonable precautions, and failure to use nonasbestos products when permitted by contract.  He also brought strict liability claims.  He passed away just a month after filing suit. His wife and children substituted as plaintiffs.

The Defendants[2] timely removed the case under the federal officer removal statute, but the Plaintiffs sought remand.  The district court construed all of the Plaintiffs' claims as negligence claims.  It then found that federal jurisdiction did not exist because the shipyard retained discretion in its safety policies and could have complied with both the government's requirements for the vessels' construction and its state law duties of care.

## II.

Orders remanding a case to state court are generally not reviewable.  *See* 28 U.S.C. § 1447(d).  The statute governing removal procedure provides for only two exceptions: remand orders involving certain civil rights cases, 28 U.S.C. § 1443, and remand orders involving the federal officer removal statute, 28 U.S.C. § 1442.  *See* 28 U.S.C. § 1447(d).

---

[2] The shipyard and its successors, as well as various insurance company defendants, jointly removed this action.  Our analysis focuses on the shipyard because it is the defendant that had the contractual relationship with the government.

No. 15-30514

Our unusual ability to review a remand order in this context reflects the importance Congress placed on providing federal jurisdiction for claims asserted against federal officers and parties acting pursuant to the orders of a federal officer. *See Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007); *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998) (both noting that the Supreme Court has long required "liberal" construction of the statute). The reasons for federal jurisdiction in cases against federal officers and their agents borrow from the rationales for both diversity and federal question jurisdiction.[3] *See Watson,* 551 U.S. at 150 (describing the purposes of federal officers' right to remove cases to federal court). As with diversity jurisdiction, there is a historic concern about state court bias. *See id.* ("State-court proceedings may reflect 'local prejudice' against unpopular federal laws or federal officials." (quoting *Maryland v. Soper (No.1)*, 270 U.S. 9, 32 (1926))); *Willingham v. Morgan*, 395 U.S. 402, 405 (1969) ("Obviously, the removal provision was an attempt to protect federal officers from interference by hostile state courts."). As with federal question jurisdiction, there is a desire to have the federal courts decide the federal issues that often arise in cases involving federal officers. *See Watson*, 551 U.S. at 150 (emphasizing the importance of "federal officials [having] a federal forum in which to assert federal immunity defenses"); *see also* 14C Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 3726 (4th ed. 2015) (noting that

---

[3] The federal officer removal statute actually has a more venerable lineage than the general federal question jurisdiction statute. The first federal officer removal statute was enacted in 1815 to address state court claims brought by shipowners against federal customs officials in New England states that opposed a trade embargo with England enacted during the War of 1812. *See Watson*, 551 U.S. at 147–48 (citing Customs Act of 1815, ch. 31, § 8, 3 Stat. 198). It has since been amended a number of times. *Id*. 148–49. In contrast, aside from its inclusion in the Judiciary Act of 1801, which was repealed the next year, the general federal question jurisdiction statute has only been on the books since 1875. *See* Richard H. Fallon, Jr., et al., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 34, 905 (5th ed. 2003).

4

one of the statute's "basic purposes" is to ensure federal officers have a "federal forum in which to assert federal immunity defenses").

Given these purposes, it is not surprising that the statute speaks in broad language allowing the removal of any state case commenced against:

> The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

28 U.S.C. § 1442(a)(1). Recognizing that such "broad language is not limitless," even in a statute that should be afforded a "liberal construction," the Supreme Court has articulated limits based on the statute's "language, context, history, and purposes." *Watson*, 551 U.S. at 147, 157 (holding that a company does not "act[] under" an officer of the United States merely because it is subject to federal regulation). The result is a three-part inquiry for determining whether federal officer removal is proper that aims to ensure that removal occurs when there is a "federal interest in the matter." *Winters*, 149 F.3d at 398 (quoting *Willingham*, 395 U.S. at 406).

The first question is whether the defendant seeking to remove is a "person" within the meaning of the statute. *Id.* At first glance, this may seem like a difficult hurdle, as a private shipyard does not seem like the typical "federal officer" defendant that might face state court hostility. Yet the Supreme Court has long recognized that the removal statute also applies to private persons and corporate entities "'who lawfully assist' the federal officer 'in the performance of his official duty.'" *Watson*, 551 U.S. at 151 (quoting *Davis v. South Carolina*, 107 U.S. 597, 600 (1883)). The current statute reflects this understanding with its "or any person acting under that officer" provision. 28 U.S.C. § 1442(a)(1). Whether the shipyard is a "person" entitled to invoke

the statute thus turns out to be the easiest inquiry. *See Winters*, 149 F.3d at 398 (holding that a government contractor that supplied Agent Orange was a "person" that could invoke federal officer removal statute). Indeed, the parties agree that the shipyard and its executive officers constitute "persons" under the statute.

The additional two inquiries are the subject of this appeal. First is whether the federal government was directing the defendant's conduct and whether that federally-directed conduct caused the plaintiff's injuries. *See Bartel v. Alcoa S.S. Co.*, 805 F.3d 169, 172–74 (5th Cir. 2015) (explaining that mere federal involvement does not satisfy the causal nexus requirement; instead, the defendant must show that its actions taken pursuant to the government's direction or control caused the plaintiff's specific injuries). This "causal nexus" requirement is the one the district court found lacking. As a result, it did not reach the final inquiry, which is whether the defendant asserts a colorable federal defense. *Id.* at 172.

Before reviewing the district court's finding of no causal nexus, we note another manifestation of the statute's "liberal construction" that impacts our analysis. Although the principle of limited federal court jurisdiction ordinarily compels us to resolve any doubts about removal in favor of remand, *see Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 339 (5th Cir. 2000), courts have not applied that tiebreaker when it comes to the federal officer removal statute in light of its broad reach, *see Watson*, 551 U.S. at 147 (emphasizing the statute's "broad language"). We thus review the district court's decision *de novo*, without a thumb on the remand side of the scale. *See Winters*, 149 F.3d at 398 ("[The] right [of removal] is not to be frustrated by a grudgingly narrow interpretation of the removal statute."); *see also Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1252 (9th Cir. 2006) ("We take from [the statute's] history a clear command from both Congress and the Supreme Court that when federal

officers and their agents are seeking a federal forum, we are to interpret section 1442 broadly in favor of removal."); *City of Cookeville, Tenn. v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 390 (6th Cir. 2007) (the same) (citing *Durham*).

With respect to the negligence claims, we agree with the district court that the federal government's mandate of asbestos insulation did not cause the shipyard to engage in the challenged conduct. Negligence claims typically involve allegations that the defendant acted unreasonably or failed to act when it would have been reasonable to take some additional measures. Most of the claims in this case are of the latter sort. For example, the Savoies allege that the shipyard is liable for "[f]ailing to provide clean, respirable air and proper ventilation," "[f]ailing to provide necessary showers and special clothing," and "[f]ailing to warn of the dangers of exposure to asbestos."

Just last year, we decided that nearly identical allegations of a failure to warn or take safety precautions concerning asbestos did not challenge actions taken under color of federal authority even though the government was responsible for the existence of the asbestos. *See Bartel*, 805 F.3d at 174. *Bartel* was brought against the operators of ships owned by the Navy. We explained that although the federal government had installed asbestos in the ships, it had not prevented the operators from warning plaintiffs about the dangers of asbestos or from adopting safety procedures to minimize the workers' asbestos exposure. *Id.* at 173–74. We thus affirmed the remand of the case to state court for lack of a causal nexus. *Id.* at 174–75.

We are not persuaded by the Defendants' attempt to distinguish *Bartel* based on either the nature of the negligence claims alleged here or the degree of the shipyard's discretion. The Savoies' allegations are essentially the same as the ones made in *Bartel* alleging "failure to warn, failure to train, and failure to adopt procedures for the safe installation and removal of asbestos." *Id.* at

173. As in *Bartel*, the shipyard has failed to demonstrate that its contracts with the government prevented it from taking any of these protective measures identified by Plaintiffs. The only evidence it presented to the contrary is the affidavit of Edward Blanchard, the shipyard's supervisor and executive officer, who stated that the Navy inspected and oversaw the vessels for safety. But even he later clarified in a deposition that no federal officer "directed or controlled the [the shipyard's] [s]afety [d]epartment." Other evidence in the record, including testimony from the shipyard's own safety officer, confirms that the government had no control over the shipyard's safety procedures. At most, the Navy may have had the power to shut down projects that failed to comply with federal regulations, but the Navy neither imposed any special safety requirements on the shipyard nor prevented the shipyard from imposing its own safety procedures.

The Savoies' negligence claims thus challenge discretionary acts of the shipyard free of federal interference. As a result, the government's directions to the shipyard via the contract specifications did not cause the alleged negligence, and those claims do not support removal.

This analysis was sufficient to affirm the remand order in *Bartel* because the negligence claims were the only ones we considered. The plaintiffs had also argued that a maritime claim for unseaworthiness, which is essentially a strict liability claim,[4] could satisfy the causal nexus requirement, but they did so too late having raised the issue only on appeal. *Id*. at 174. We thus had no

---

[4] *See also McBride v. Estis Well Serv., L.L.C.*, 768 F.3d 382, 394 (5th Cir. 2014) (Clement, J., concurring) (observing that "unseaworthiness was 'an obscure and relatively little used remedy' until it became a strict liability action during the 1940s" (quoting *Miles v. Apex Marine Corp.*, 498 U.S. 19, 25 (1990)).

occasion to determine whether federal officer removal was proper for unseaworthiness or other strict liability causes of action. *Id.*

This case requires us to answer that question as the Savoies assert strict liability causes of action under Louisiana law. LA. CIV. CODE ANN. art. 2317. And removal of the entire case is appropriate so long as a single claim satisfies the federal officer removal statute. Wright & Miller, § 3726.

The district court found that the claims the Savoies labeled as "strict liability" causes of action in actuality alleged negligence. This is true of some of the claims given that label such as the one that alleges that the shipyard "was aware or *should have been aware* of the dangerous condition presented by exposure to asbestos" yet "failed and/or willfully withheld from Mr. Savoie knowledge of the dangers to his health from exposure to asbestos fiber." (emphasis added). But others—"All defendants had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury of Mr. Savoie and for which these defendants are strictly liable under Louisiana law"—are based on the mere use of asbestos on the ships and therefore fit the strict liability label.

As for these claims that sound in strict liability, there is an additional wrinkle. The wrongful death claims cannot be based on strict liability. Those claims are governed by the law in effect at the time the decedent passes away. *See Landry v. Avondale Indus., Inc.*, 877 So. 2d 970, 972 (La. 2004). "Strict liability was abolished in Louisiana in 1996. *See, e.g.*, *Small v. Baloise Ins. Co. of Am.*, 753 So. 2d 234, 240 (La. App. 4 Cir. 1998) ("By requiring knowledge or constructive knowledge under Article 2317.1, the Legislature effectively eliminated strict liability under Article 2317, turning it into a negligence claim.

This substantive change should not apply retroactively . . . .'" (quoting Frank L. Maraist & Thomas C. Galligan, LOUISIANA TORT LAW § 14–1, at 331 (1996))).

But as a survival action allows survivors to bring the claims the decedent could have asserted were he still alive, survival claims based on asbestos exposure are governed by the law in effect when the exposure occurred. *See, e.g., Rando v. Anco Insulations Inc.*, 16 So. 3d 1065, 1072 (La. 2008) (explaining that "law effective on the date of [] significant exposure to asbestos" applies to claim alleging occupational asbestos exposure) (internal quotations omitted). Because Savoie worked at the shipyard for almost half a century prior to Louisiana's abolition of strict liability, that pre-1996 law governs.

So the question becomes: do the survival claims alleging strict liability based on mere use of asbestos at the shipyard give rise to federal jurisdiction? The Savoies argue that even under the old "strict liability" regime, Louisiana law still required a showing that the defendant failed to act with reasonable care, which would bring the claims under *Bartel*.  But our best reading of Louisiana law is that a strict liability plaintiff need only prove the following: (1) that the asbestos-containing products that caused his damages were in the "care, custody, and control" of the defendant; (2) that the asbestos-containing products had a "vice, ruin, or defect that presented an unreasonable risk of harm"; and (3) "that the vice, ruin, or defect was the cause-in-fact of the plaintiff's damages." *Dupree v. City of New Orleans*, 765 So. 2d 1002, 1007–08 & n.5 (La. 2000) (stating the elements for a strict liability claim prior to 1996 and recognizing that the exercise of reasonable care was not a defense to strict liability); *see also Wilde v. Huntington Ingalls, Inc.*, 616 F. App'x 710, 715 (5th Cir. 2015) (per curiam); *Watts v. Ga.-Pac. Corp.*, 135 So. 3d 53, 59 (La. App. 1 Cir. 2013) (recognizing that occupational exposure to asbestos can give rise to

No. 15-30514

strict liability claims).[5]  Of course, strict liability is not automatic liability as the "unreasonable risk of harm" element requires cost-benefit analysis to establish a defect.  W. Page Keeton et al., PROSSER AND KEETON ON THE LAW OF TORTS §§ 78, 99, at 555–56, 695 (5th ed. 1984).  Yet that defect question is determined at the time of design or manufacture, with downstream users like a shipyard becoming responsible once that defect is proven (thus the "strict liability" label).  *Id.* § 99, at 695–96**.**

This analysis of the elements of strict liability under pre-1996 Louisiana law largely resolves the "causal nexus" inquiry for federal officer removal.  The strict liability claims rest on the mere use of asbestos, and that use at the shipyard was pursuant to government directions via contract specifications.  Unlike claims based on negligence, those based on strict liability do not turn on discretionary decisions made by the shipyard.  *See Bartel*, 805 F.3d at 172–74 (discussing what is required to support a claim for negligence and how a strict liability claim for unseaworthiness might be different).

We have previously recognized that strict liability claims support federal officer removal when the government obligates the defendant to use the allegedly defective product that causes the plaintiff's harm.  *See Winters*, 149

---

[5] The Plaintiffs rely heavily on language from *Kent v. Gulf States Utilities Co.*, 418 So. 2d 493 (La. 1982) that suggests that reasonable care is a defense to strict liability, which would make their claims based on strict liability essentially indistinguishable from their negligence claims for the purposes of this case.  But that language was merely dicta, and other language in the same opinion suggests that reasonable care would *not* be a defense to a strict liability claim.  *See id.* at 497 ("*Under strict liability concepts, the mere fact of the owner's relationship with and responsibility for the damage-causing thing gives rise to an absolute duty to discover the risks presented by the thing in custody.*").  Indeed, that case did not even rest on a decision about strict liability, but on negligence because the defendant had actual knowledge of the risk of harm.  *See Hebert v. Gulf States Utilities Co.*, 426 So. 2d 111, 114 (La. 1983) (noting that *Kent* was a negligence case).  And in any event, the Louisiana Supreme Court's more recent decision almost two decades later in *Dupree* is binding on this court.  *See Ford Motor Co. v. Dall. Power & Light Co.*, 499 F.2d 400, 410 n.17 (5th Cir. 1974) (noting that when interpreting state laws, federal courts are "Erie-bound" by the state supreme court's most recent authority).

11

F.3d at 398–400. In *Winters*, the plaintiff brought strict liability claims against chemical manufacturers for producing Agent Orange, a toxic herbicide that the government used during the Vietnam War to quickly defoliate large areas in order to gain military advantage. *Id.* at 390, 399. The plaintiff claimed that she was exposed to Agent Orange while working as a nurse in Vietnam and that it caused her terminal cancer. *Id.* at 390. In finding federal officer removal proper, we concluded that the government's detailed specifications and supervision over Agent Orange's production, packaging, and delivery, as well as the compulsion under threat of criminal sanctions to meet the government's specifications, established that the defendants had "acted pursuant to federal direction and that a direct causal nexus exist[ed] between the defendants' actions taken under color of federal office and [the plaintiff's] claims." *Id.* at 399–400; *see also Bartel*, 805 F.3d at 173 (characterizing the causal nexus in *Winters* as resting on these grounds).

That causal relationship also exists here between the government's requirements that the shipyard use asbestos in constructing its Navy and Coast Guard vessels and Savoie's asbestos exposure while working on those same vessels. Like the chemical manufacturers in *Winters*, the shipyard was compelled to meet the government's detailed specifications for what products and materials could be used in the construction of its vessels. And "the only products that [the shipyard] could have used to insulate pipes . . . [as required by contract] on ships it built for the Navy through mid-1969 contained asbestos." As in *Winters*, the government exercised supervision over the shipyard's work to ensure compliance with contractual requirements. And although the shipyard did not face criminal sanctions for failing to meet the government's specifications as the manufacturers in *Winters* did, the shipyard was contractually required to comply and could receive no payments until it certified that all contractual requirements had been met. Thus it is the

government's detailed specifications, to which the shipyard was contractually obligated to follow, that required the use of asbestos that allegedly caused Savoie's death. This is enough to show a causal nexus between the Savoies' strict liability claims and the shipyard's actions under the color of federal authority. The district court erred in finding that this requirement was not satisfied.

This does not necessarily mean that removal was proper. Recall a third requirement, whether the defendant possesses a colorable federal defense. The shipyard proposes two: the federal contractor defense, *see Boyle v. United Technologies Corp.*, 487 U.S. 500, 512–13 (1988) (recognizing for the first time the federal contractor defense and setting forth its elements), and a preemption defense under the Longshore and Harbor Workers' Compensation Act, *see* 33 U.S.C. § 905(a) (employer immunity provision), § 933(i) (co-employee immunity provision).

As the district court never had the opportunity to consider whether these defenses are colorable, we will remand to allow it to do so in the first instance. *See, e.g.*, *Humphries v. Elliott Co.*, 760 F.3d 414, 417–18 (5th Cir. 2014) (remanding for consideration of the colorable federal defense requirement when the district court had not reached the issue); *Cf. Robertson v. Exxon Mobil Corp.*, — F.3d —, 2015 WL 9592499, at *3 (5th Cir. Dec. 31, 2015) (remanding to district court to determine whether other exceptions to jurisdiction under CAFA apply where district court had not reached such arguments). As only the survival claims alleging strict liability satisfy the first two requirements of federal officer removal, it is only defenses to those claims—that is, defenses existing under the law that existed when Savoie was exposed to asbestos—that

No. 15-30514

should be considered in determining whether the shipyard asserts colorable federal defenses.[6]

\* \* \*

For these reasons, we VACATE the district court's remand order and REMAND the case for resolution of the remaining jurisdictional requirement.

---

[6] This means that Defendant's preemption defense is governed by the law at the time Savoie was exposed to asbestos, which occurred before the Louisiana Worker's Compensation Act was amended in 1989 to eliminate any concurrent coverage between that Act and the federal Longshore and Harbor Workers' Compensation Act. *See* La. Rev. Stat. 23:1035.2 (providing that "[n]o compensation shall be payable in respect to the disability or death of any employee covered by . . . the Longshoremen's and Harbor Worker's Compensation Act, or any of its extensions . . .").

14